# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

**DANIEL K. JAMES,**

                    **Plaintiff,**

**v.**                                                   **CIV. No. 97-488 JP/RLP**

**KENNETH ROSS GRIECHEN,**
**in his individual capacity,**

                    **Defendant.**


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case arises from the arrest on March 4, 1996 of the Plaintiff by the Defendant, a Los Alamos County Police Officer.  It is the unfortunate story of a private financial dispute between two men that developed into a criminal investigation of the Plaintiff and culminated in his arrest for the crime of larceny.  Regrettably, Plaintiff's arrest, overnight detention, and arraignment–events initially unforeseen by anyone connected with the case–ultimately resulted in damage to Plaintiff's marriage and business.

In Count I of his First Amended Complaint brought under 42 U.S.C. § 1983, Plaintiff asserts that Defendant Griechen violated his constitutional rights by arresting him without probable cause in violation of the Fourth Amendment; in Count II, Plaintiff contends that Defendant falsely arrested and illegally imprisoned him; in Count III, Plaintiff presents a claim of battery; and in Count IV, Plaintiff alleges that Defendant maliciously prosecuted him.

The parties presented their evidence at a trial without a jury.  For the most part, the parties

and other witnesses are in agreement as to the facts of the case.  In accordance with Federal Rule of Civil Procedure 52(a), I find that the facts set forth below have been proven by a preponderance of the evidence.

## Findings of Fact

Plaintiff Daniel James is a licensed general contractor who resides in Española, New Mexico.  In February 1996 James was building a house at 20 Maple Court in Los Alamos, New Mexico.  He hired Mark Trujillo to do the tile work in the bathrooms, kitchen, and laundry room as well as to install marble in the entryway and in an additional bathroom.  James and Trujillo agreed that Trujillo would receive $300 for materials and $380 for a portion of his labor costs up front, and that the balance would be paid upon completion of the job.

Trujillo began working at 20 Maple Court on February 21, 1996.  However, when Trujillo was late in arriving at work that day and each day thereafter, James became concerned that the tile work would not be completed on time.  On the morning of February 26, 1996 James inspected the work Trujillo had done and found the marble installation to be of poor quality.  James then took Trujillo's tile saw and moved it to another construction site nearby.  When Trujillo arrived at 20 Maple Court later that morning, James told him that his work was unacceptable and demanded that he repay the $680 James had already advanced to him, but Trujillo refused.  James then demanded that Trujillo leave his tools in James' possession until Trujillo could repay him.  Again, Trujillo refused.  James then informed Trujillo that he would hold Trujillo's tile saw until the money was repaid.  Trujillo did not agree to this and called the police.

Defendant Ross Griechen and Corporal Charles Ney responded to Trujillo's call and went to 20 Maple Court to talk to James and Trujillo.  James told Griechen that he was holding the saw

2

as collateral for Trujillo's debt until he was repaid and that he wanted no problems with the police. After hearing the nature of the dispute between James and Trujillo, Griechen stated that theirs was a "civil dispute" and that the saw should remain at 20 Maple Court until Trujillo provided proof of ownership of the saw, at which point James would have to return it to Trujillo. James told Griechen that he wanted no problems with the police, that he did not want to go to jail, that he would keep the saw at 20 Maple Court, and that if Trujillo proved he owned the saw then James would return it to him.

Two or three days after James and Trujillo met with Griechen and Ney on February 26, Trujillo went to Los Alamos and presented Officer Ney with an owner's manual and receipt of purchase for the tile saw.

Sometime after the meeting on February 26, 1996 at 20 Maple Court, James took the saw from Los Alamos and moved it to his home in Española for safekeeping. However, James did not tell Griechen that he had moved the saw to his home for that purpose.

On March 1, 1996 James called Trujillo to again demand repayment of the $680. James also informed Trujillo that the marble he had laid needed to be removed at a cost of $529 and that Trujillo would be responsible for that amount in addition to the original debt of $680. Trujillo stated that he did not have the money and needed his tile saw to earn it. Griechen became aware through conversations with Trujillo and with James that James had increased the amount he claimed Trujillo owed him from the original $680 to approximately $1,200 and James may have explained to Griechen the reason for this increase.

James called Trujillo again on March 4, 1996 to demand repayment and to offer Trujillo a payment plan for his debt. Trujillo refused James' offer. On March 4, 1996 James also received a

telephone call from Griechen, who had recently learned from Trujillo that James had moved the tile saw to James' home in Española.  Griechen informed James that Trujillo had presented proof of ownership of the saw.  Griechen told James that the fact that Trujillo owed him money did not entitle James to take Trujillo's property.  Griechen then asked James when he could bring the saw to Los Alamos.  James responded, "not right now but possibly this evening."  After the conversation with Griechen ended, James wrote down the tile saw's serial numbers, called Griechen back, and asked for the serial numbers provided by Trujillo.  Unbeknownst to Griechen, the numbers Griechen had in his possession and which he gave to James were shipping numbers taken from the saw's owner's manual and were not the actual serial numbers.  After hearing the numbers recited by Griechen, James asserted that the numbers were not even close to those on the tile saw and that he would not return the saw.  Griechen accused James of never intending to return the saw, to which James replied "I do not want Mark's stupid saw.  All I want is my money."  Griechen responded that if James did not return the saw, Griechen would start a criminal investigation.  James replied, "Fine, good.  This is not that saw.  I don't want to go to jail but until Mark pays me or provides proof of ownership I am keeping the saw."

Sometime within the next few days James and Griechen spoke on the telephone again. Griechen informed James that the tile saw was not stolen and asked if he could see it.  James replied that he was not planning on going to Los Alamos right away because he did not have any work there.  Griechen inquired when he could see the saw, and James responded that he would let Griechen know.  At this point, Griechen had learned, either from James or Trujillo, that James was offering Trujillo a payment plan for repayment of the debt.

By March 5, 1996 Griechen was convinced that James had no intention of returning the

4

tile saw to Trujillo.  After consulting with his supervisor, who advised him that it appeared that

James had committed larceny, Griechen drafted an affidavit (See Plaintiff's Exhibit 4) in support

of an arrest warrant and a criminal complaint against James for the crime of larceny.  Griechen

read the affidavit over the phone to Assistant District Attorney David Ceballes, who approved it

that day.

        James and Griechen spoke again on March 7, 1996.  James admitted to Griechen that he

had taken the saw from 20 Maple Court, but did not concede that the saw belonged to Trujillo.

Instead, James refered to it as "the saw Mark was using" and said he did not know "whether it is

Mark's saw or he borrowed it."  James also said that "until he (Trujillo) pays me or provides

proof of ownership, tough!"  Once again, Griechen told James that he needed to see the tile saw

and asked James when he could bring it to Los Alamos.  James responded that he did not know,

but that maybe he could bring it that evening around six or six thirty, but that he had to talk to his

wife and he would let Griechen know.  However, James did not bring the saw to Los Alamos on

March 7, 1996.   Later that day, Griechen presented Magistrate Judge Morris with his sworn

affidavit, which she accepted and on the basis of which she issued the arrest warrant.  Judge

Morris then set bail for James at $4000 and noted this on the warrant.  (Defendant's Exhibit F).

        On March 9, 1996 James and his family departed on a planned vacation and returned

home on the evening of March 13, 1996.  Neither Griechen nor any other Los Alamos police

officer had instructed James not to leave town.  James did not tell Griechen or any other police

officer that he would be away from his home for a five day vacation beginning March 9.  While

James was away, Griechen and fellow Los Alamos Police Officer Lieutenant Brooks attempted to

reach James by telephone, to no avail.  Griechen felt that James was avoiding the police.  Upon

returning home James discovered many messages from the Los Alamos Police Department on his telephone answering machine, as well as one message from a New Mexico State Police Officer informing James that they had a warrant for his arrest.  James called the Los Alamos Police Department that evening and spoke with Griechen, who asked James to drive to Los Alamos so that Griechen could inspect the saw.  Despite the fact that he had already driven for eleven hours that day, James agreed.  James also asked Griechen if he had a warrant for James' arrest. Griechen lied, telling James that no warrant existed.

When James arrived at the Los Alamos police station on the evening of March 13, 1996, Griechen admitted that he had lied about the warrant and placed James under arrest.  In response to Griechen's request, James helped Griechen unload the tile saw from James' truck and carry it into the police station.  During this time Griechen looked at the serial numbers on the saw and saw that they were the same as those given to him earlier by James.  Back inside the police station, Griechen put his hand on James' shoulder to guide him toward a hallway, where James gave Griechen his knife and leatherman tool.  Griechen then put his hand on James' shoulder again and directed him to another door leading to a room with a counter.  Griechen told James that Judge Morris had said she would probably let James go or drop the charges.  Griechen then tried several times to reach Judge Morris, who had requested that she be notified when James was taken into custody, but Griechen was unable to contact her because she was out of town. Griechen looked at James apologetically, but did not attempt to reach another magistrate judge. Because an effective arrest warrant had been issued by Judge Morris, Griechen did not feel that he had the authority to quash the warrant or to let James go.

Griechen allowed James to use the telephone.  James called his wife and told her that he

6

had been arrested.  Mrs. James asked if she should contact a lawyer or a bail bondsman.  James, who was irate and who appeared to her to be irrational, told her to do "nothing."  Next, James was put into a cell where his personal belongings were inventoried and he changed into an orange jumpsuit and thongs.  James spent the night of March 13 in the Los Alamos County jail.  In the morning of March 14, 1996, he was fingerprinted and photographed.  Later that day James was cuffed, shackled, and taken to Santa Fe for arraignment.  The Magistrate Judge reduced the bail for James to $2000, and James returned to Los Alamos, where he and his wife posted bail.  James was released from the jail the evening of March 14.

At some later time, the Assistant District Attorney dismissed the charges against James.  However, James' arrest appeared in the Los Alamos Monitor and his business was adversely affected by the bad publicity.  Furthermore, James was very embarrassed and angered by the entire incident.

## Conclusions of Law

Count I

The first issue to be addressed is whether Griechen violated James' established Fourth Amendment right to be free from unreasonable seizures in contravention of 42 U.S.C. § 1983.  The defense of qualified immunity shields government officials performing discretionary functions from liability for money damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, in assessing a claim of qualified immunity I must "determine the objective reasonableness of the challenged conduct by reference to the law clearly established at the time of the alleged constitutional violation."  Austin v. Hamilton, 945 F.2d

1155, 1160-61 (10th Cir. 1991), <u>rev'd on other grounds</u>, <u>Johnson v. Jones</u>, 515 U.S. 304, 115

S.Ct. 2151 (1985).  <u>Accord</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987).

In this case, the law is quite clearly established.  An affidavit in support of a warrant must

contain sufficient facts to enable a neutral and detached magistrate to make an independent

determination that probable cause exists to believe that a crime has been committed and that the

person named in the warrant committed the crime.  <u>Illinois v. Gates</u>, 462 U.S. 213, 239-240

(1983).  However, I also note that "[a]n official can violate the Constitution and still be protected

by qualified immunity."  <u>Trujillo v. Simer</u>, 934 F. Supp. 1217, 1224 (D. Colo. 1996). <u>See</u> <u>also</u>

<u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991)(stating that qualified immunity shields officers from

suit for damages from unlawful arrest if reasonable officer could have believed arrest to be lawful

in light of clearly established law and information arresting officers possessed); <u>Malley v. Briggs</u>,

475 U.S. 335, 341 (1986) (asserting that "the qualified immunity standard provides ample

protection to all but the plainly incompetent or those who knowingly violate the law").  Qualified

immunity provides officers with "protection from reasonable error because police should not

always err on the side of caution out of fear of being sued."  <u>Trujillo</u>, 934 F.Supp. at 1224.  Thus,

whether Griechen actually violated James' rights under the Fourth Amendment is irrelevant if, at

the time of his actions, Griechen reasonably believed that the arrest of James was legal.  This

question centers upon a determination of whether the affidavit in support of the arrest warrant

reasonably appears to contain facts constituting probable cause to arrest James on March 13,

1996.

Larceny is defined as "the stealing of anything of value which belongs to another."  NMSA

1978, § 30-16-1.  The New Mexico Uniform Jury Instruction on larceny, SCRA 1986, Crim. UJI

14-1601, states that in order to convict a defendant of larceny, the trier of fact must find that the defendant took and carried away property belonging to another, and that at the time defendant took the property he intended to permanently deprive the owner of it.

During the trial of this case there was little or no dispute that James took the tile saw belonging to Trujillo without his consent and that James had no property interest in the saw. Instead, the parties contest the issue of whether or not Griechen had probable cause to believe that James intended to permanently deprive Trujillo of the saw.

Under the evidence presented at trial, Griechen did have sufficient facts to form a basis for probable cause to believe that James took the tile saw with intent to permanently deprive. First, James told Griechen that he had taken the saw as "collateral" for the money James claimed Trujillo owed him. The purpose of collateral is to provide security to a creditor in the event that the debtor does not pay his debt. However, the debtor must agree to give the collateral as security for his debt. Trujillo never agreed that the saw could be used as collateral to secure payment of what James contended Trujillo owed him. In this case, James took Trujillo's saw without his permission and refused Trujillo's demands that he return the saw. James, without any legal right, insisted on keeping the saw until Trujillo paid him. Thus, it was reasonable for Griechen to believe that James—who without justification treated the saw as collateral for the debt—intended to keep the saw indefinitely or sell it to recover the money James claimed Trujillo owed.

Second, Trujillo told Griechen that without his saw he was unable to work and earn money to repay James. From this information Griechen inferred that Trujillo would not pay his debt and James, who regarded the saw as collateral, would either permanently keep the saw or

sell it.  Third, James removed the tile saw from 20 Maple Court despite the fact that he and

Griechen had an understanding that the saw would remain there until the dispute was resolved.

Griechen later found out from Trujillo that the saw had been moved to James' home in another

town.   Fourth, James denied Griechen's repeated requests that James bring the saw to Los

Alamos after Griechen told James that Trujillo had presented satisfactory proof of ownership of

the saw.  Although James never refused to bring the saw, his vague allusions to the possibility of

bringing the saw to Los Alamos in the near future went unfulfilled.  Fifth, James almost doubled

the amount of money he demanded from Trujillo, making it more unlikely that Trujillo would be

able to meet James' demands for payment before returning the saw.

All of these facts, when taken together, provide adequate support for Griechen's belief, as

of the date Griechen obtained the arrest warrant, that James had taken the tile saw with intent to

permanently deprive Trujillo of the saw.

However, James argued at trial that Griechen omitted certain key facts from his affidavit

which tend to show that James did not have the requisite intent when he took Trujillo's saw.  The

first such omission James pointed to was his statement to Griechen on March 4, 1996 that, "I

don't want to go to jail but until Mark pays me or provides proof of ownership I'm keeping the

saw."  I do not believe that James' statement bears on whether he took the saw with intent to

permanently deprive Trujillo of possession.  In fact, that statement merely reveals James' position

that he would keep the saw as long as he wanted, or at least until he was forced by the police to

return the saw to Trujillo.

Second, James points to Griechen's failure to include in the affidavit an explanation for the

increase in James' monetary demand from $680 to $1200.  Even if Griechen had stated in the

affidavit that James had explained the increase in the amount demanded from Trujillo because of the corrective work necessitated by Trujillo's poor workmanship, this would not have negated the showing of probable cause. Trujillo consistently told both James and Griechen that, without the use of his saw, he could not earn money to repay James the $680 originally demanded. Nevertheless, James refused to return the saw to Trujillo. Providing an explanation for James' increased demand of about $1,200 does not suggest that James had changed his mind about returning the saw to Trujillo.

Third, James contends that Griechen's failure to include in the affidavit the fact that James offered Trujillo a repayment plan was a material omission. This is not a material omission from the affidavit because the information merely duplicates James' earlier statements that he would not give the saw back to Trujillo until he was paid. Indeed, this information regarding a payment plan reinforces a finding of probable cause on the issue of intent because it shows James' plan to keep the saw until James was inclined to return it, an event that may never have occurred. Thus, Griechen's omission of this information from his affidavit is not fatal.

Finally, James objects to Griechen's omission of his statements of intent to return the saw after he was paid. Specifically, James argues that Griechen should have included James statement to the effect that he did not want Trujillo's "stupid saw" and that all he wanted was his money. However, in at least two places in the affidavit (in his descriptions of the events of February 26 and March 4, 1996) Griechen set forth James' expression of his intent to return the saw after being paid by Trujillo. Any further information would have been duplicative and would not have aided the Magistrate in her determination of probable cause.

Thus, I conclude that as a matter of law Griechen's affidavit was sufficient to support a

finding of probable cause and that the information omitted from the affidavit would not alter that finding.  As a result, Count I of James' First Amended Complaint should be dismissed with prejudice.

Count II

In Count II of his First Amended Complaint, James asserts claims for false arrest and illegal imprisonment.  Given my determination that Griechen had probable cause to arrest James, the Plaintiff's claim of false arrest must necessarily fail.  Furthermore, in New Mexico, false imprisonment involves the unlawful interference with the personal liberty or freedom of locomotion of another.  Diaz v. Lockheed Electronics, 95 N.M. 28, 30, 618 P.2d 372, 374 (Ct. App. 1980).  Again, because probable cause to arrest James existed, Griechen's interference with his personal liberty was not unlawful.

James argues that even if Griechen did have probable cause to make the initial arrest of James, Griechen should have released James after James brought the saw to the police station and Griechen was unable to reach Magistrate Judge Morris.  In sum, James contends that Griechen, armed with the knowledge that James had delivered the tile saw and that Judge Morris had said she would probably either release James or drop the charges, was obligated to liberate James despite the existence of a valid arrest warrant requiring James to post $4000 for bail.

At the trial the parties presented conflicting expert testimony on this issue.  Thomas Gillespie testified that under the circumstances Griechen's failure to release James was malicious. Gillespie expressed his opinion that Griechen should have either obtained the approval of another judge to allow James to go free or that Griechen should have taken it upon himself to release James.  On the other hand, Mike Bowen testified that as a general rule, police officers do not

"unarrest" a person who has been arrested under the auspices of a search warrant signed by a judge.  He also testified that in similar circumstances a more experienced police officer might take it upon himself to call the Assistant District Attorney and inform her that he was releasing the arrestee, but that often younger police officers do not like to deviate from an arrest warrant or from instructions that have been given by a judge.  Bowen asserted that it would have been reasonable for Griechen either to keep James in custody or to take the initiative in releasing James.  I find Bowen's testimony on this issue to be more credible, and therefore conclude that it was not unreasonable for Griechen to arrest James and keep him in custody until James posted bail.  Thus, Count II should be dismissed with prejudice.

<u>Count III</u>

James asserts that Griechen committed the tort of battery when he placed his hand on James' shoulder at the Los Alamos County jail.  The Restatement of Torts (2d), § 18 (1963) states:

> An actor is subject to liability to another for battery if
>      (a) he acts intending to cause a *harmful or offensive* contact with the
>      person of the other or a third person . . . and
>      (b) an offensive contact with the person of the other directly or indirectly
>      results.

(emphasis added).  In this case, there was no evidence produced at trial that Griechen's act of placing his hand on James' shoulder was a contact that was harmful to James.  Thus, James can recover for battery only if the contact was offensive.  But, there also was no evidence produced at trial on this issue.  James did not testify that he found the touch of Griechen's hand on his shoulder offensive.  Even if there had been such testimony, however, I would still conclude that as a matter of law Griechen's act was not one which a reasonable person under the circumstances

13

would find offensive.  <u>See</u> REST. 2D OF TORTS, Comment (f) (1963) ("There are many contacts

which no *reasonable* man or woman would regard as offensive if brought about by particular

persons . . . but which everyone would regard as highly offensive if inflicted by other

persons.")(emphasis added);  REST. 2D OF TORTS, Comment (g)(1963) ("The interest which one

has in the inviolability of his person and, therefore, in freedom from unpermitted contacts which,

while offensive to a *reasonable* sense of personal dignity cause no substantial or tangible bodily

harm, is an interest of dignity rather than of material value.") (emphasis added).  From the

testimony, it was clear that Griechen placed his hand on James' shoulder for the reasonable

purpose of directing James to a room or place inside a building that was unfamiliar to James.  This

is not a contact that a reasonable person would find offensive, and Count III should be dismissed

with prejudice.

<u>Count IV</u>

        In Count IV of his First Amended Complaint, James asserts that Griechen maliciously

prosecuted him.  In New Mexico, to prevail on a claim for malicious prosecution a plaintiff must

prove, first, that the defendant initiated criminal proceedings against plaintiff without probable

cause; second, that the proceedings were initiated primarily for a purpose other than that of

bringing an offender to justice;  and third, that the proceedings have terminated in favor of the

accused.  <u>Johnson v. Weast</u>, 123 N.M. 470, 475,  943 P.2d 117, 122 (Ct. App. 1997)(citing

<u>Zamora v. Creamland Dairies, Inc.</u>, 106 N.M. 628, 632, 747 P.2d 923, 927 (Ct. App. 1987)).

However, the New Mexico Supreme Court has recently held that the formerly separate torts of

malicious prosecution and abuse of process should be merged into the single tort of "malicious

abuse of process," defined by the following elements: (1) the initiation of judicial proceedings

14

against the plaintiff by the defendant;  (2) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end;  and (4) damages.  <u>Devaney v. Thriftway Marketing Corp.</u>, 953 P.2d 277, 283 (N.M. 1997)  In its discussion of the second element, the court stated that "the traditional elements of a lack of probable cause under the former tort of malicious prosecution and of an act not proper in the regular prosecution of a claim under the former tort of abuse of process serve to protect the important interest of access to the courts, thereby preventing any chilling effect on the legitimate use of process."  <u>Id</u>. at 283.  Thus, the New Mexico Supreme Court concluded that "to demonstrate the overt act required in an action for malicious abuse of process, a plaintiff may show the defendant filed an action against that plaintiff without probable cause."   <u>Id</u>. at 285.  As stated above, Griechen did have probable cause to arrest James for larceny.  However, a plaintiff asserting a claim of malicious abuse of process can also demonstrate a misuse of process "through some irregularity or impropriety suggesting extortion, delay, or harassment . . . . Under this method, the act might be a procedural irregularity, or might be an act that otherwise indicates the wrongful use of proceedings, such as an extortion attempt."  <u>Id</u>. at 287 (internal citations omitted).  Again, there was no evidence suggesting procedural impropriety.  Because the second element of James' claim of malicious abuse of process is not met, Count IV should be dismissed with prejudice.


_____

**UNITED STATES DISTRICT JUDGE**